**MAINE PUBLIC SERVICE COMPANY et al.**

v.

**PUBLIC UTILITIES COMMISSION.**

Supreme Judicial Court of Maine.

Argued Jan. 13, 1987.

Decided April 29, 1987.

---

William S. Harwood (orally), Verrill & Dana, Portland, for plaintiff.

Joseph G. Donahue, James A. Buckley (orally), Maine Public Utilities Com'n, Augusta, for defendant.

Before ROBERTS, WATHEN, GLASSMAN, SCOLNIK and CLIFFORD, JJ.

WATHEN, Justice. .

Maine Public Service Company (MPS) pursuant to 35 M.R.S.A. § 303 (Supp.1986) appeals from a decision handed down following an investigation by the Public Utilities Commission (Commission) finding that a merger of MPS and Central Maine Power Company (CMP) would be in the public interest and beneficial for MPS ratepayers.[1] Although the Commission casts its conclusions as findings and avoids entering any explicit order, we conclude that the decision is ripe for review and we sustain the appeal.

In July 1984, MPS filed with the Commission revised rates designed to generate increased revenue of about $7,130,920 in base rates or about a 25% increase in MPS's revenue. In the ratemaking pro-

1. Dirigo Electric Cooperative, Inc., a non-profit, non-stock corporation that serves as a joint service organization for the eleven consumer-owned utilities in Maine was granted intervenor status in the proceedings before the Commission and joins MPS in this appeal.

ceedings that followed, inquiry focused almost exclusively on MPS's investment in the Seabrook Nuclear Power Plant (Seabrook), which amounted to about 65% of MPS's assets. In a concurrent, but independent investigation pursuant to 35 M.R.S.A. § 296 (1978), 37.3% of MPS's investment in Seabrook was determined to be imprudently incurred. Because it was known that MPS would likely face insolvency if a significant portion of MPS's Seabrook investment were determined imprudent, the possibility of bankruptcy figured in the ratemaking proceedings.

Determining that bankruptcy of MPS was not in the ratepayers' interest and desiring to avert the imminent danger of bankruptcy, the Commission decided to permit MPS to recoup its prudent Seabrook investment by reducing its amortization period from a 30–year life-of-the-plant period to 56 months. The Commission made clear that this was a temporary measure pursuant to 35 M.R.S.A. § 311 (Supp.1986) designed to avoid immediate bankruptcy by increasing rates "above levels produced by normal rate setting policy." The Commission also announced that it would

> commence an investigation to determine whether a merger with one or more other Maine utilities or some other reorganization or modification is in the ratepayer's interest. If the investigation shows a merger or other action to be in the public interest or that our concerns regarding the impact of bankruptcy are excessive, we will re-examine the § 311 portion of the Company's rates and determine whether the temporary rates should be continued, modified, or terminated.

Accordingly, the Commission initiated an investigation pursuant to 35 M.R.S.A. § 296 on May 12, 1985, to determine whether major reorganization, including merger of MPS with another Maine utility was in the public interest. Hearings were held in Presque Isle and Augusta in the fall of 1985. Meanwhile in an unrelated rate case, CMP signed a stipulation on May 24, 1985, in which CMP agreed to pursue the acquisition of MPS on certain conditions including required regulatory approval and appropriate manifestation of local support. Despite

the broad language in which the purpose of the investigation was framed the inquiry focused on whether a merger of MPS and CMP was in the public interest. On February 19, 1986, a hearing examiner filed a report of recommended findings indicating that a merger of MPS and CMP was in the public interest.

On March 14, 1986, the Commission ordered MPS to show cause why its temporary rates, approved pursuant to 35 M.R.S.A. § 311 in the 1985 MPS rate proceeding, should not be terminated and amortization based on 30–year life-of-the-plant period be resumed. The rates based on 56-month amortization had been instituted as a stop gap measure until MPS could negotiate with potential buyers of its Seabrook investment. Relying on a March 24, 1986 stipulation that spelled out a proposed sale of all MPS's Seabrook investment to another utility the Commission concluded that MPS had alternatives less costly to its ratepayers than the temporary measures and, on April 18, 1986, ordered MPS to file adjusted tariffs reflecting a resumption of the 30–year amortization life-of-the-plant period.

Despite the abandonment of the temporary rate increase, which had served as justification for the investigation into the propriety of merger, the Commission nevertheless handed down on May 15, 1986, a decision finding that merger of MPS and CMP would result in overall benefit to MPS's ratepayers, and stating that it would "give serious consideration to possible changes in MPS's rates if management fails to pursue the merger." It is from this order that MPS appeals.

The Commission concedes that it has no statutory authority to order the merger of CMP and MPS, and denies that it is attempting to accomplish that end by threats of reprisal through ratemaking. The Commission contends that the decision constitutes merely a restatement of general regulatory principles and serves only as a notice or warning of future action that might be taken. Consistent with its interpretation of the order, the Commission urges us

to dismiss this appeal on the ground that, as a matter of judicial discretion, the decision is not ripe for judicial consideration and action.

■ We must first characterize the effect of the order before we consider the issue of ripeness. In the statement of historical perspective accompanying the fifteen page decision, the Commission notes that "[i]t is the Seabrook situation and the associated requests for extraordinary rates which has raised the question as to *whether MPS's continued existence in the corporate form is the least expensive way to provide electricity to its customers.*" (emphasis added). The decision itself begins with the observation that "as part of the stipulation settling a Central Maine Power Company rate case, CMP and the Public Advocate agreed that CMP would pursue the acquisition of MPS." The fact that CMP obligated itself to pursue a merger permitted the Commission to confine the investigation to the reasonableness of such a merger. The Commission explained the situation well by stating in its decision that it "is not being asked to order a merger, and such an order is not necessary in any event because CMP has agreed to pursue acquisition of MPS if certain conditions are satisfied." Comparing the advantages of a merged operation against the continued operation of MPS, the Commission concluded that MPS rates in the future would be significantly higher than rates for a merged company. After illustrating a 9.2% differential in retail rates and a 2.9% differential in wholesale rates, the Commission stated:

> In that context, one further comment regarding rate differentials should be clearly understood, especially by Maine Public Service. Utilities are required to supply power at just and reasonable rates. The consequences of unreasonable or imprudent acts or practices will not be borne by ratepayers. *Action by management that rejects a cheaper source of power—whether a generating source, a purchase, a cost-saving measure, or a change in corporate form—is presumptively unreasonable and/or imprudent.*

It is not up to Maine Public Service's management to determine whether a particular merger offer is in the best interests of the offeror or the offeror's other customers any more than MPS would make such a determination regarding an offer from a power or equipment supplier. If a proposed transaction is likely to provide the best alternative for MPS's customers (especially as in this case where the shareholders are also benefitted), MPS management has an obligation to pursue it. *A failure to fulfill this duty may be the basis for an adjustment to rates commensurate with the economic loss to ratepayers.*

The Commission decision concludes as follows:

> For these reasons, we find that a merger of Maine Public Service Company and Central Maine Power Company would be beneficial for MPS ratepayers. *Under these circumstances, we will give serious consideration to possible changes in MPS's rates if management fails to pursue the merger.*

(emphasis added).

We are unable to accept the Commission's assertion that the decision is only a restatement of general regulatory principles. When considered in context, the decision constitutes an order requiring MPS to pursue a specific merger with a party who is under an order to pursue the acquisition of MPS. Although it is technically correct that the Commission has not explicitly ordered a merger, as was recognized by the Commission, the confluence of the CMP order and the MPS decision renders an express order unnecessary. MPS would have us go further and construe the decision as ordering an adjustment of rates if MPS does not act prudently by pursuing the merger. We are unable to conclude that the Commission has ordered such an adjustment and therefore, for purposes of review, we consider the decision as ordering only that MPS pursue a merger with CMP.

▆▆ We next determine whether such an order is subject to judicial review. Analysis of the ripeness issue involves two principal points of focus; the fitness of the issue for judicial decision, and the hardship to the parties of withholding court consideration. *Maine Public Service Company v. Public Utilities Commission,* 490 A.2d 1218, 1221 (Me.1985). The decision in question presents a concrete and specific legal issue, namely, does the Commission have the authority to order MPS to pursue a merger with CMP. It is beyond dispute that the decision has a direct, immediate and continuing impact on MPS. Moreover, we are satisfied that immediate review can only aid the Commission in making use of its lawful regulatory powers. For these reasons we reach the merits of the appeal.

▆▆ Once having characterized the decision as an order to pursue a merger, the merits present little difficulty. The Commission does not contend that it has such authority. The Commission's powers are derived wholly from statute. *New England Telephone and Telegraph Co. v. Public Utilities Commission,* 362 A.2d 741, 753 (Me.1976); *Stoddard v. Public Utilities Commission,* 137 Me. 320, 323, 19 A.2d 427, 428 (1941). Moreover, the Commission may not use its rate setting authority to attach conditions to the rates it sets, if it could not have attached those conditions in reliance on statutory authority distinct from its rate setting authority. *New England Telephone,* 362 A.2d at 754. Finally, 35 M.R.S.A. §§ 104 and 211 (1978 & Supp. 1986), which treat reorganizations, mergers, and acquisitions require that the Commission consent and authorize proposed transactions, but do not confer power to mandate such transactions. We conclude that the Commission exceeded its statutory authority in ordering MPS to pursue a merger with CMP.

The entry is:

The Commission Order dated May 15, 1986 is reversed.

ROBERTS, GLASSMAN, and SCOLNIK, JJ., concurring.

CLIFFORD, Justice, dissenting.

Because I think this appeal is not ripe for appellate review, I respectfully dissent. Whether the Commission has statutory authority to order a merger is not the real issue in this appeal. The Commission has expressly conceded that it had no such authority. The crux of MPS's appeal is its concern that its failure to make itself amenable to fundamental corporate reorganization will be taken into account by the Commission as one aspect of the prudence doctrine affecting the establishment of just and reasonable rates in a future ratesetting procedure.

The policy of this court is not to issue advisory opinions but to delay ruling on matters until they are "*'ripe'* for judicial consideration and action." *Lewiston, Greene & Monmouth Tel. Co. v. New England Tel. & Tel. Co.,* 299 A.2d 895, 907 (Me.1973). Because of the complexity of the issue of the relationship between the prudence doctrine and corporate reorganization, we cannot effectively, and therefore should not, evaluate its merits until we are presented with concrete facts in a future ratesetting procedure.

The agency action appealed from is essentially a statement of findings. Since the evidentiary basis of those findings in the record is not challenged on appeal, this court has nothing to review. The Commission's statements that it *may* adjust MPS's rates "commensurate with the economic loss to ratepayers" and that it "will give *serious consideration* to possible changes in MPS's rates" (emphasis added) are not even "policy statement[s] of what the Commission intends to do in the future," *Maine Water Co. v. Public Util. Comm'n,* 388 A.2d 493, 499 (Me.1978), much less "a concrete, firm disposition of rights and obligations" of MPS. *Lewiston, Greene,* 299 A.2d at 908; *see also New England Tel. & Tel. Co. v. Public Util. Comm'n,* 448 A.2d 272, 303 (Me.1982). It is precisely to avoid such entanglement "in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a

concrete way by the challenging parties," *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), that the ripeness doctrine came into being as a matter of judicial restraint.

Nor is there perceptible hardship to MPS in withholding judicial consideration. *See id.* at 149, 87 S.Ct. at 1515. The Commission has not directed MPS "to take specific action within prescribed time limits immediately operative." *Lewiston, Greene,* 299 A.2d at 908. Though the Commission has undoubtedly raised the issue whether MPS's failure to make itself amenable to fundamental corporate reorganization is a legitimate factor to be taken into account in setting future rates, there is no "avowed commitment by the Commission to effectuate its own plan in accordance with controlling principles, formulas and computations meticulously prescribed in the [decision]."

*Id.* Despite the vague directive to pursue merger, a directive acknowledged on all sides as a nullity, there clearly is no requirement of affirmative conduct resting on MPS as a result of the May 15 decision. *Contrast New England Tel. & Tel. Co. v. Public Util. Comm'n*, 390 A.2d 8, 57–58 n. 40 (Me.1978); *Central Maine Power Co. v. Public Util. Comm'n*, 395 A.2d 414, 423 (Me.1978); *Lewiston, Greene,* 299 A.2d at 908.

I would grant the Commission's motion to dismiss.